# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| TIDEL ENGINEERING L.P., § | |
|     Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. 2:07-CV-77 (TJW) |
| § | |
| FIRE KING INTERNATIONAL, INC. ET § | |
| AL., § | |
|     Defendants. § | |
| § | |

## MEMORANDUM OPINION AND ORDER

After considering the submissions and the arguments of counsel, the Court issues the following order concerning the claim construction issues:

## I.   Introduction

Plaintiff Tidel Engineering, LP. ("Tidel") alleges Defendant Fire King International, Inc. ("FKI") infringes claims 1, 3, 5, 6, and 9 of U.S. Patent No. 5,742,034 ("the '034 patent"), and claims 2 and 3 of U.S. Patent No. 5,813,510 ("the '510 patent"). Tidel also seeks a declaratory judgment that it does not infringe United States Patent 7,063,252 ("the '252 patent"), and that the '252 is invalid and unenforceable. FKI counter claims that Tidel infringes claims 1, 3, 4, 11, 13, and 22 of the '252 patent.

## II.  Background of the Technology

The '034 patent describes a cash deposit system for receiving, safekeeping, and accounting for currency accumulated in the course of business. The '034 patent describes a deposit safe that consists of a box-like housing with a bill receiving unit that can validate a bill. The system contains an electronic accounting system for receiving and processing the data from the bill receiving unit, and generating accounting data files from the same. The safe is equipped with a means to control

a number of people that are allowed access to the safe and accounting data. The data can be retrieved in a number of ways, including accounting by individual or total transactions. The invention also provides that an "intelligent safe" can process the data from other safes on the network, i.e., "economy safes."

The '034 patent describes a money handling device (a safe) for use at or near a point of purchase. Specifically, the invention is directed to a secure device for changing money from one denomination to another (making change) or for changing from one system of currency to another. The invention keeps track of the amount of money inside a safe and accounts for transactions. A user can insert a ten dollar bill, for example, and then receive a selection of smaller denominations in return. In some embodiments, the user can insert one country's currency and receive another country's equivalent in exchange.

The '252 patent describes an invention that consists of an electronic lock and money control system that merchants use to collect and dispense money during business operations. The system is capable of stand alone operation as well as expanded networking and control of multiple units. In this embodiment, one of the units operates as a centralized network controller. The units consist of a bill validator apparatus and a secure housing for storing the validated bills. Inside of the safe are containers each containing a predetermined value of money and a way to dispense that money from the safe. The centralized network controller keeps track of and provides accounting type information from it and all of the safes on the network.

### III. General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc.*

*v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id*. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id*. "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set

forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id*. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. The patent is addressed to and intended to be read by others skilled in the particular art. *Id*.

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315 (*quoting Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id*. at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

4

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id*. Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id*. at 1319-24. The approach suggested by *Texas Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id*. at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on

the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id*. The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id*. at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant. The court now turns to a discussion of the disputed claim terms.

## IV.    The '034 Patent

### A.    Agreed Constructions

The parties have stipulated to the construction of the following terms in the claims:

"Bill receiving apparatus" means "bill acceptor that can determine the value of and validate paper currency."

"Means for connecting" means "a data/electronic communications link."

"Memory" means "computer readable memory."

"Paper currency deposit and validating system" means "cash deposit system for receiving,

safekeeping and authenticating paper currency."

"Plurality" means "more than one."

"Accommodating" means "enabling."

"Mounted" means "attached to."

"Coupled" means "in data/electronic communication."

"Removably mounted" means "not permanently affixed."

"Digital input means" means "the keypad."

**B.      Disputed Constructions**

     **1.      "economy safe"**

Tidel proposes this term means "a safe that is performing at a lesser capacity than the intelligent safe." FKI proposes the term means "safes comprised of just a safe and a bill validating unit, without a PC board and printer." The specification describes an arrangement where one central "intelligent safe" can be coupled to a plurality of "economy models of the safe." [4:23-30] Tidel points out that the specification describes that "economy models of the safe (i.e., comprised of just a safe and a unit 16, without a PC board and printer) can be placed at various locations throughout a retail establishment and coupled to the above-described 'intelligent' safe for processing of data by bill receiving unit and by totals." [4:22-34] Tidel argues, therefore, that "economy safes" need only perform at a lesser function than the "intelligent safes" that process data from them. Tidel argues the parenthetical is only a description of one embodiment, and that "economy safes" may, or may not, have a printer or PC board.

Tidel fails to meaningfully explain the applicant's choice of "i.e." instead of "e.g." Tidel's argument that the parenthetical only shows an example of a preferred embodiment is unpersuasive.

"[T]his interpretation of 'i.e.' is contrary to the literal meaning of this abbreviation for the Latin *id est*, meaning 'that is'" *Caritas Techs., Inc. V. Comcast Corp.*, 2:05-CV-339 at 13 (E.D. Tex. 2006) (Folsom, J.) (citing *Oxford English Dictionary*). The Federal Circuit has found that "i.e." defined the meaning of a term. *Abbot Labs. V. Novapharm Ltd.*, 323 F.3d 1324, 1330 (Fed.Cir. 2003). Only when the intrinsic evidence supports an alternate definition of the term preceding "i.e." has the Federal Circuit found that the definition following "i.e." does not control. *See Phizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1373 (Fed.Cir. 2005). The specification in *Phizer* referred to "saccharides (i.e. sugars) . . ." *Id.* at 1373. The specification, however, also contained an entire section labeled "SACCHARIDES," with a detailed explanation. The Federal Circuit found, therefore, the definition of "saccharides" was not as narrow as what followed "i.e."

The '034 patent's specification has no alternate definition for "economy safe." Indeed, the term "economy safe" is not used but one time in the specification. Following that only instance is the parenthetical "(i.e., comprised of just a safe and a unit 16, without a PC board and printer)." The court, therefore, construes the term "economy safe" to mean a "safe comprised of just a safe and a bill validating unit, without a PC board and printer."

### 2. "intelligent safe"

Tidel proposes this term means "a safe that can supervise and account for user transactions at another safe." FKI proposes that intelligent safe means "safe having a mounted PC board with a CPU." The specification provides:

> In addition, the illustrated PC board 114, CPU 116 and associated software have the capacity to serve and process from a plurality of bill receiving and validating units 16. Consequently, economy models of the safe (i.e., comprised of just a safe and a unit 16, without a PC board and printer) can be placed at various locations throughout a retail establishment and coupled to the above-described "intelligent"

safe for processing of data by bill receiving unit and by totals.

[4:23-34].

FKI argues that "intelligent safe" is depicted by Figure 3 and described in the specification from Col. 2, l. 8 to Col. 4, l. 25. Further, the specification distinguishes "economy safes" from "intelligent safes" by the absence of a PC board and printer. Further, FKI argues that a PC board is necessary to process the data.

Tidel argues that the specification is clear that an intelligent safe only needs the ability to couple to an "economy safe" to process data; there is no requirement of a PC board. The "above described" safe in the specification is the preferred embodiment. While the preferred embodiment does include a PC board, FKI's argument that one is necessary to process the data is unpersuasive. Neither side addresses what, if anything, could be used for processing the data other than the PC board. The patent, however, does not restrict "intelligent safe" in such a way. The specification describes "intelligent safe" relative to an "economy safe," and by what it does; that is for "processing of data by bill receiving unit and by totals." [4:28-30] The court, therefore, construes "intelligent safe" to mean "a safe that can supervise and account for user transactions at another safe."

### 3. "generating a signal proportionate to the denomination of each validated bill"

Tidel proposes the term means "creating a communication that indicates the value of the bill as read by the bill receiving apparatus." FKI takes a different approach and seeks construction of "signal" and "proportionate" separate from the combined term. The specification provides that after a bill is accepted by the bill validator, "a signal pulse emitting a credit valuation proportionate to the denomination of the validated bill is initiated . . ." [2:33-39]

9

Tidel argues the phrase is detailed enough to clearly indicate what it means, therefore, the plain and ordinary meaning of the phrase should apply. FKI proposes "signal" should be construed as "a fluctuating electric quantity, such as voltage, current or electric field, whose variations represent information." FKI argues this construction is the plain and ordinary meaning of "signal" in the electrical arts. FKI's proposed construction is an attempt to limit the signal to an analog signal. The specification makes clear that some electrical "pulse," associated with a particular denomination of a bill, is emitted. FKI comes forward with no meaningful support for its proposition that the signal must be analog.

Next, FKI proposes that "proportionate" means "corresponding in size, degree, or intensity while having the same or a constant ratio." FKI cites to an extrinsic source for the definition of "proportionate": "corresponding in size degree or intensity." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 997 (11th ed. 2003). It argues, however, that "proportionate" requires an additional limitation as it is used in the patent. FKI argues that the term must be construed as to require a constant ratio be maintained between the denomination of the bill and the signal. FKI argues this is because "proportionate" modifies "signal." FKI's argument is unpersuasive and there is no support for this limitation in the specification.

FKI proposes the phrase means "generating a signal that varies some signal attribute (e.g. amplitude or duration) based upon a mathematical relationship with the value of the bill being validated." FKI argues the plain and ordinary meaning of the term "becomes clear" once the constructions of "signal" and "proportionate" are read into this construction. As discussed above, FKI finds no meaningful support in the specification for its proposed construction. The court, therefore, construes the term "generating a signal proportionate to the denomination of each

10

validated bill" to mean "creating an electrical communication that indicates the value of the bill as read by the bill receiving apparatus."

### 4. "mounted on"

Tidel proposes the term means "attached to." FKI proposes the term means "mounted externally, not internally." Tidel's only argument is that FKI agreed to "attached to" for the construction of "mounted" in claim 3. FKI argues the plain and ordinary meaning; "on" is "on" and does not allow for "in." The specification provides that the bill receiving apparatus in the preferred embodiment can be "mounted on the interior surface or rear face of the safe door." [2:54-55] The applicant clearly intended for multiple ways to mount the apparatus. There is no support for FKI's argument that the mounting must only be on the exterior part of the door. The term mounted by itself does not connote only an attachment to the surface of the door. Mounted is defined as "set up or adjusted for use." *Oxford English Dictionary*. The court, therefore, construes "mounted on" to mean "attached for use."

### 5. "data input means"

This phrase is governed by 35 U.S.C. § 112 (6). Accordingly, the "data input means" includes the corresponding structures and their equivalents cited in the specification. Tidel argues the structure includes a keyboard, key pad, smart card reading means or other digital input equivalents. [2:40-46; 3:54-55] FKI argues that "smart card reading means" is ambiguous and without structure in the specification. Tidel does not address this issue. Nowhere in the specification is "smart card" defined, and it is too indefinite to provide structure. FKI also argues that because the specification defines a keypad as a "digital input device," the inclusion of that in the definition is superfluous. Tidel does not address this argument. The corresponding structure for

11

"data input means," therefore, is "a keyboard 22 or keypad 22, and their equivalents."

## V. The '510 Patent

### A. Agreed Constructions

The parties have stipulated to the construction of the following terms in the claims:

"Accept and register" means "authenticate and value inserted bills."

"Cash drop receptacle" means "a device that holds the money inserted through the cash drop."

"Coupled to" means "in data/electronic communication."

"Currency acceptor" means "a device to authenticate and value paper currency."

"Point-of-sale" means "at or near point of purchase."

"For recording" means "for making a record of."

"Produces" means "creates."

### B. Disputed Constructions

#### 1. "supply of coins"

Tidel proposes that the term means "stored coins." FKI proposes the term means "segregated coins by denomination within hoppers." FKI argues the embodiment in the specification requires that all the coins inside the cabinet must be placed into separate bins or hoppers according to denomination. [7:44-56]. FKI is attempting to limit the claim to the preferred embodiment by requiring the coins be segregated. The court, therefore, construes the term "supply of coins" to mean "stored coins."

#### 2. "dispensing means for dispensing coins from said supply"

This phrase is governed by 35 U.S.C. § 112 (6). Accordingly, "dispensing means" includes

12

the corresponding structures and their equivalents cited in the specification. Tidel proposes this term means "a dispenser that can dispense coins and/or paper currency (either in rolled form or single or multiple bills from a stack), including the coin dispense mechanism." FKI argues there is no corresponding structure in the specification, therefore, Claim 1 is rendered invalid.

FKI argues that Tidel's construction includes only the function of "dispensing means," and is devoid of any structure. Tidel's proposal includes "dispenser," however, which is structural. The relevant part of the specification is:

> FIG. 3 shows the drop safe 20 with the door 23 opened to expose the mechanisms inside the security cabinet 24. A receptacle tray or bin 30 is situated beneath the drop safe drawer 25 to receive money or other valuables that are inserted into the safe by means of the drawer **25. On a slide-out shelf 31 is mounted a coin dispensing mechanism 32 which includes a plurality of bins or hoppers, including in this embodiment four bins, with a bin 33 for dollar coins, a bin 34 for quarters, a bin 35 for nickels, and a bin 36 for pennies.** Any bill can be changed from some combination of these four coin denominations. However, the mechanism 32 may optionally include an additional dispenser for dimes (10c), and/or a dispenser for paper currency denomination, e.g. $5 bills. The latter dispenser can take any variety of forms, and can dispense, e.g., rolled bills or single or multiple bills from a stack. **The mechanism 32 can accommodate up to eight bins or hoppers, and can also accommodate a currency dispenser**.

[7:38-55]

The specification describes a coin dispensing mechanism that consists of a plurality of bins or hoppers that can also accommodate a currency dispenser. The corresponding structure, therefore, is "a dispensing mechanism 32 consisting of hoppers or bins 33, 34, 35, and 36 and their equivalents."

  3.  **"money dispensing mechanism"**

Tidel proposes this term means "a device to dispense coins and/or paper currency from inside

of the safe." FKI proposes the term means "a four-to-eight bin set of hoppers wherein a bin is assigned to loose dollar coins, quarters, nickels, pennies and optionally dimes the mechanism also dispenses rolled bills and single or multiple bills from a stack." FKI argues that the specification describes alternative embodiments of coin dispensing mechanisms having four bins, five bins, or six bins. Further, FKI argues, the specification teaches that the "money dispensing mechanism" has up to eight bins. FKI is attempting to limit the claim to the preferred embodiment described in the specification. Additionally, FKI is attempting to limit "money dispensing mechanism" to the "dispensing means" construed above. Here, however, the "dispensing means" is only one subcomponent of the "money dispensing mechanism."[1]

At the court's request, the parties filed supplemental briefs on whether the term should be construed under 35 U.S.C. § 112 ¶ 6. The Federal Circuit has found that "mechanism" at times lacks sufficient structure to avoid § 112 ¶ 6. Because the word "means" is not found in the claim, there is a presumption that § 112 ¶ 6 does not apply. *Lighting World v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) The presumption, however, is rebuttable. The "generic terms 'mechanism,' 'means,' 'element,' and 'device,' typically do not connote sufficiently definite structure" to avoid § 112 ¶ 6. *Massachusetts Institute of Technology and Electronics for Imaging, Inc. v. Abacus Software,* 462 F.3d 1344, 1354 (Fed. Cir. 2006). Sometimes § 112 ¶ 6 can be avoided if the generic term is further defined in the claim language. *See id.* For example, the Federal Circuit found that "detent mechanism" provided sufficient structure to avoid § 112 ¶ 6. *Greenberg v.*

---

[1] "money dispensing mechanism . . . containing a supply of coins of a plurality of denominations, a receptacle for coins dispensed from said supply located on the exterior of said secure locking cabinet, and dispensing means for dispensing coins from said supply through a penetration in said secure locking cabinet to said receptacle for coins." [claim 1, 11:63-12:5]

14

*Ethicon Endo-Surgery, Inc*. 91 F.3d 1583 (Fed.Cir. 1996). The definition of "detent" was well understood in the art, and that definition "connoted sufficient structure to avoid § 112 ¶ 6." *Id.* In *MIT*, however, the Federal Circuit held that "colorant section" as a modifier to "mechanism" did not provide sufficient structure to a claim because "colorant section . . . has no dictionary definition, and there is no suggestion that it has a generally understood meaning in the art." *MIT*, 462 F.3d at 1354.

In *MIT,* the claim language that defined "colorant mechanism" was only in terms of the function that "colorant section" provided. *Id.* Additionally, the defendant has cited to two recent cases where the Federal Circuit has found that "mechanism" did not connote sufficient structure to avoid § 112 ¶ 6. *See Aspex Eyewear, Inc. v. Altair Eyewear, Inc*., 288 Fed.Appx. 697, 704 (Fed.Cir. 2008); *See also Welker Bearing Co. v. PHD, Inc.* _F.3d_, 2008 WL 5205639 (Fed.Cir. 2008).

In *Welker*, the court found that "mechanism for moving said finger" did not provide sufficient structure to avoid § 112 ¶ 6. *Welker* at *4. The claim "provide[d] no structural context for determining the characteristics of the "mechanism" other than to describe its function." *Id.* In *Aspex*, the Court found that "retaining mechanism" was too broad to connote structure, and unlike "detent" in *Greenburg*, "retaining" had no well understood meaning in the art. *Aspex*, 288 Fed.Appx. at 704.

While "money dispensing" may not have a well understood meaning in the art, the claim language as a whole connotes sufficient structure to avoid § 112 ¶ 6. The generic term is defined in the claim language. *See MIT*, 462 F.3d at 1354. Unlike the cases cited by the defendant, the term at issue is not defined simply by the function it performs. Indeed, it is defined by structural elements: "supply of coins" and "receptacle for coins." [11:63-65]. Additionally, the inventor did not use "mechansim" synonymously with "means"; the "money dispensing mechanism" *includes* a

"dispensing means" as one of its defined components. [11:63-12:5] Accordingly, the defendant has failed to rebut the presumption that "mechanism" should not be construed under § 112 ¶ 6.

Because the term is defined by structural components in the claim, the court construes the term using the plain and ordinary meaning of the language used in the claim. The term incorporates both "stored coins" and "dispensing means," which the court has construed above. Those constructions, therefore, are incorporated in the construction of "money dispensing mechanism." The court construes "money dispensing mechanism" as "a device for dispensing money that includes stored coins of more than one denomination, a receptacle for coins dispensed from storage, and a dispensing mechanism 32 consisting of hoppers or bins 33, 34, 35, and 36 and their equivalents."

### 4. "means for releasing"

This phrase is governed by 35 U.S.C. § 112 (6). Accordingly, the "means for releasing" includes the corresponding structures and their equivalents cited in the specification. Tidel proposes that the two structures for accomplishing this function of money releasing is 1) a cash chamber located in the drawer that receives money and drops the money [5:7-16] and 2) a receptacle in the drawer which is open to receive cash and then releases the cash [8:9-17]. FKI proposes the term means "a mechanism that opens the underside of a cash receiving drawer so as to release its contents into a cash drop receptacle."

The relevant parts of the specification are:

Preferably, the cash drop is in the form of a drawer that slides out from the secure locking cabinet to an open position and slides in to a closed position. A cash chamber receives money when the drawer is slid open, and drops the money into the cash drop receptacle when the drawer slides in to its closed position. The drawer preferably includes a display coupled to the control mechanism for displaying the money credit amount, i.e., escrow amount, during a change- making transaction.

[5:7-16]

> As shown here, a receptacle 39 in the drawer 25 is open at the upper side to receive an accumulation of cash, a traveler's check, or other valuable item. When the drawer 25 is closed, the receptacle opens at its underside, so that the cash or other item drops into the receptacle tray 30. There is also an LCD screen 40 on the drawer 25, to display e.g. the amount of money deposited into the currency acceptor 27 and the amount of money value in escrow during a change making operation.

[8:7-17]

FKI makes the same unpersuasive argument; Tidel's proposed corresponding structure is devoid of structure and only describes the function. Tidel, however, points to chambers and drawers, which are clearly structural elements. The corresponding structure, therefore, is "a chamber or drawer 25 and their equivalents"

## VI. The '252 Patent

### A. Agreed Constructions

The parties have stipulated to the construction of the following terms in the claims:

"Processor" means "a printed circuit board that possesses a computer processor, i.e. a microprocessor, microcontroller, CPU or DSP."

"When connected to" means "capable of exchanging data through a data link."

"Safe" means "a stand alone electronic lock and money collection/dispensing unit."

"Control system" means "an apparatus with which information is sensed and used to control."

"Set of openings" means "more than one opening."

"Accumulate and track" means "record and keep a tabulation."

"Electronic locking and money control devices" means "devices and/or units (e.g. safes) that

have at least one electronic lock and controls the receipt and/or dispensing of money."

"Network" means "a plurality of devices and/or components arranged to communicate with each other."

"Central processing system" means "a processor capable of remotely operating remote electronic locking and money control devices."

"Arranged to receive and recognize" means "configured to accept and process."

"On the network" means "connected via a data/electronic communication path."

"Connector interface mounted to the housing" means 'component fixed to the housing of a safe that provides connectivity among various system components and network devices."

"Central system controller" means "a processor that is part of the safe, though not necessarily internal to the safe, which operates to control remote safes in the network."

"Remote safe" means "an electronic lock and money collection/dispensing unit physically remote from a first such unit."

"Integrated with" means "acting as part of."

"Other network devices" means "devices, other than the central processing system, having unique network addresses and capable of communicating over a network."

    **B.**    **Disputed Constructions**

    **1.**    **"interior compartment"**

Tidel proposes this term means "compartment interior to the housing having an inner door and lock mechanism." FKI proposes the term means "a compartment inside a safe." FKI argues that Tidel is trying to limit the claim to the preferred embodiment.

The specification describes the "inner compartment 58 is denoted in dashed outline [in Fig.

18

3] to indicate an approximate location. This compartment is used to hold manual drops, and is protected by its own inner door and lock mechanism." [4:41-44] Further, the specification provides:

> An outer door provides the first line of physical security. An inner door is any door that cannot physically be opened unless an outer door is first opened. The use of one or more inner doors allows general access to the safe for getting tills, change, and so forth while allowing larger deposit funds or valuables to remain secured behind an inner door.

[3:54-59]

Tidel's construction is an attempt to limit the inner compartment to the preferred embodiment; that is one having a lock. The claim language is "a housing having an interior compartment for securing money, and an outer door . . ." [10:62-63] While a lock is one way to secure contents of the compartment, there may be other ways. For example, the compartment may provide security by being hidden. The court, therefore, construes "interior compartment" to mean "a compartment inside a safe."

### 2. "monitor and accumulate"

Tidel proposes the term means "ongoing observation and keeping." FKI proposes the term means "keep track of and gather." "Monitor" generally means "to observe, supervise, or keep under review; to keep under observation; to measure or test at intervals" *Oxford English Dictionary*. "Accumulate" generally means "to amass or collect." *Oxford English Dictionary*.

Tidel argues that "ongoing" must be included in the definition because the transactions are automatically communicated to the central control unit. This is unpersuasive. There is no support for requiring this limitation in the definition. The court, therefore, construes "monitor and accumulate" to mean "to keep under observation and collect."

## VII. Conclusion

The Court adopts the constructions set forth in this opinion for the disputed terms of the '034, '510, and '252 patents. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

SIGNED this 6th day of January, 2009.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE